# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

UNITED STATES OF AMERICA,
Plaintiff,

vs.

ANTHONY REDMAN,
Defendant.

Case No. 20-cr-39-CJW

**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS**

---

## I.     INTRODUCTION

On May 20, 2020, the Grand Jury charged Defendant with one count of Possession of a Firearm by a Prohibited Person in violation of 18 U.S.C. Sections 922(g)(1) and 924(a)(2).  (Doc. 2.)  The charge arose from a November 26, 2019 arrest where Defendant was found to be in possession of a Glock Model 42 .380 semi-automatic firearm.  (*Id.* at 1.)

The matter before the Court is Defendant's Motion to Suppress and Addendum to Motion to Suppress.  (Docs. 27, 34.)  The Government timely filed resistances.  (Docs. 29, 35.)   The Honorable Charles J. Williams, United States District Court Judge, referred the motion to me for a Report and Recommendation.

I held a hearing on Tuesday, October 6, 2020.  (Doc. 31.)  The Government called two witnesses: Officer Mark Smith with the Iowa Sixth District Department of Correctional Services[1] and Officer Matthew Martin with the Cedar Rapids Police Department.  The Government's Exhibits 1, 2, and 3 and Defendant's Exhibits A and B

---

[1] Defendant's Exhibits A and B are Sixth District Department of Correctional Services policies that became effective after the date of the incident.  Defense counsel briefly discussed the policies with Officer Smith, but ultimately did not establish any basis to doubt Officer Smith's authority to respond as a peace officer to the events discussed herein.

1

were admitted without objection.  (*Id.* at 2.)  For the following reasons, I respectfully recommend that the District Court **deny** Defendant's Motion to Suppress.

## II.     FINDINGS OF FACT

Officer Smith and Officer Martin testified at the October 6, 2020 suppression hearing.  I found them to be credible witnesses.  Therefore, unless otherwise noted, the following findings have all been adduced from Officer Smith's and Officer Martin's testimony.

On November 26, 2019, at approximately 12:44 AM, Officer Mark Smith received a high priority call to the Motel 6 at 3325 Southgate Court Southwest, Cedar Rapids, Iowa.  (Smith Hr'g Test.)[2]  The call was placed by a Motel 6 front desk employee who reported, "We just had shots ring out at the property . . . about five seconds ago." (Gov. Ex. 1 at 00:03-00:11.)  The employee described it as "a bunch of shots" that occurred "on the outside" of the building, towards the "backside."  (*Id.* at 00:33-00:40.) The employee eventually estimated that "at least 12 shots just rang out."  (*Id.* at 00:50-00:53.)

Officer Smith is very familiar with the Motel 6 area and describes it as "a high-risk area" where he has made multiple arrests in the past.  (Smith Hr'g Test.)  Officer Smith described the area as follows:

> That hotel is known for a lot of people like on probation/parole, that are wanted or absconded from supervision go there and stay there, a lot of times they pay cash, use different names. I've arrested multiple people out of that hotel that have been on the run in the past.

(*Id.*)

---

[2] Citations to hearing testimony are to the Court Reporter's rough draft of the transcript of the October 6, 2020 suppression hearing that was provided as a courtesy to the Court.  An official transcript of the hearing had not been entered into the docket at the time this Report and Recommendation was filed.

Officer Smith was in the area when the call about shots fired at the Motel 6 went out, so he arrived at the scene around 12:47 AM. (*Id.*) Officer Smith was driving an unmarked patrol car and in full uniform at that time. (*Id.*) As Officer Smith was arriving at the scene, he met with an employee who told him that "he heard the shots fired on the north side of the building." (*Id.*) Officer Smith then parked on the northwest corner of the building and exited his vehicle. (*Id.*) At no point did Officer Smith activate his lights or siren. (*Id.*) Upon exiting his vehicle, Officer Smith saw one vehicle parked and running with two individuals sitting in the front seat. (*Id.*) He saw no one else outside the motel. (*Id.*) Officer Smith then walked up to the vehicle to ask the individuals questions about the suspected gunfire. (*Id.*) At this time, Officer Smith was alone and in a dark area illuminated only by a few parking lot lights. (*Id.*) Officer Smith approached the driver's side window with his handgun holstered and asked the driver to roll his window down. (*Id.*) The driver complied and upon rolling the window down, Officer Smith noted the immediate smell of marijuana[3] and could see the driver and Defendant who was the front passenger. (*Id.*) Both held open bottles of beer while the vehicle was running. (*Id.*) Officer Smith then asked the two individuals about the shots fired in the area, and after first denying hearing anything, Defendant suggested that it might have been fireworks. (*Id.*)

Officer Smith asked the driver and Defendant for identification. (*Id.*) The driver complied, but Defendant refused. (*Id.*) Defendant then said he was not being detained

---

[3]Officer Smith is trained in detecting the odor of marijuana:

Q.    Have you had any training or experience in recognizing the odor of marijuana?
A.    Yeah, we've had different trainings, and at the academy, we've had controlled burns and
      stuff like that.
Q.    And then have you in the course of your job had experience in the detection of marijuana
      and then recovering marijuana from people in vehicles and things like that?
A.    Yeah, I've . . . came across it quite a few times.
(Smith Hr'g Test.)

3

and Officer Smith replied by asking him to stay seated in the vehicle. (*Id.*) Officer Smith then requested backup as Defendant was exiting the vehicle, contrary to the request he stay seated. (*Id.*)

Officer Martin arrived at the scene at the time Defendant was exiting the vehicle and asked Defendant how he was doing. (Gov. Ex. 2 at 00:30-00:33; Smith Hr'g Test.) Officer Smith informed Officer Martin that Defendant had refused to give him his ID at which point Defendant told Officer Martin he was not under arrest and that he stepped outside to have a drink. (*Id.* at 00:33-00:40; Smith Hr'g Test.) Officer Smith then told Officer Martin that he told Defendant "to stay here." (*Id.* at 00:53-00:56; Smith Hr'g Test.) Defendant walked toward a motel room at which point Officer Martin physically prevented Defendant from entering the motel room. (Smith Hr'g Test.; Martin Hr'g Test.)

Officer Martin is also familiar with the Motel 6 area. (Martin Hr'g Test.) Officer Martin described the motel as follows:

> Prior law enforcement exposure to Motel 6 on Southgate has been involving a number of calls for service, some of which are high priority calls for service, meaning individuals have been seriously injured or what is considered part 1 crime has taken place at that location. . . . [The Motel 6] is a transient location that typically has a lot of criminal activity and quality issues that create issues for public safety.

(*Id.*) Officer Martin arrived at the scene minutes after receiving the call that Officer Smith needed assistance at the Motel 6. (*Id.*) Officer Martin had also encountered an Uber driver at the Motel 6 who informed Officer Martin that he believed the suspected shots were actually fireworks. (*Id.*) Upon arriving, Officer Martin saw Defendant get out of an unregistered vehicle with no license plates. (*Id.*) Officer Martin confirmed that Officer Smith was

> informing me that he gave a lawful order for [Defendant] to stay in the vehicle and now he's removing himself from the vehicle and trying to go

into a room that I have no . . . as far as I'm concerned is an unknown so it could be dangerous, . . . my safety . . . and again, safety is a huge issue here for me, so I'm going to follow him.

(*Id.*)  Officer Martin then stated he

was trying to establish communication or at least draw [Defendant's] attention back to conversation because of the nature of the call and why we're there, and I also can see that he does have a drink in his hand and that, I'm making my pass of the vehicle, that there's apparent violations taking place that could need to be exhausted.

(*Id.*)  After Defendant did not respond to any of Officer Martin's requests, Officer Martin followed Defendant to the motel room door and restrained him from entering.  (*Id.*)

After taking Defendant to the ground and handcuffing him, Officer Martin began to conduct an inventory search of Defendant.  (*Id.*)  Officer Martin stated that as part of the search, he "wanted to know why [Defendant] was getting out of the vehicle and distancing himself kind of for my safety."  (*Id.*)  Officer Martin asked why Defendant was so adamant about entering the hotel room.  (Gov. Ex. 2 at 3:00-3:10.)  Defendant replied that he had grabbed the wrong coat.  (*Id.*)  As Officer Martin was searching Defendant's coat pocket, he asked Defendant if he was worried about what he was going to find in his pocket.  (*Id.* at 4:00-4:10.)  Defendant replied that he had something in his other coat pocket at which point Officer Martin located a loaded firearm.  (*Id.*; Martin Hr'g Test.)  The driver of the vehicle eventually consented to a search of his vehicle.  "Narcotics-related items" were recovered during the search of the vehicle,  including a "pill bottle with loose like marijuana in it, often referred to as shake."  (Martin Hr'g Test.)

Other facts and testimony will be introduced when relevant to the following discussion.

5

### III.   DISCUSSION

**A.    Defendant's Motion to Suppress**

"There are three categories of police encounters: (1) consensual communications involving no coercion or restraint, (2) *Terry* stops—minimally intrusive seizures that are significant enough to invoke the Fourth Amendment and must be supported by reasonable suspicion, and (3) full-scale arrests that must be supported by probable cause." *United States v. Flores-Sandoval*, 474 F.3d 1142, 1144-45 (8th Cir. 2007) (citing *Terry v. Ohio*, 392 U.S. 1, 20 (1968); *United States v. Johnson*, 326 F.3d 1018, 1021 (8th Cir. 2003)). The case at bar involves the first two types of encounters.

Defendant argues that the physical evidence of the firearm found on his person, statements made by him regarding grabbing the wrong coat, and the location of the firearm should be suppressed.  (Doc. 34 at 4.)  The specific statements Defendant seeks to have suppressed are as follows:

Officer Martin: Why are you so adamant about getting in this room?

Defendant: Because I grabbed the wrong coat sir.

. . .

Officer Martin: Is this what you're worried about, what's in this?  Chapstick?

Defendant: No, this pocket right here.

(Gov. Ex. 2 at 3:00-3:10; *Id.* at 4:05-4:13.)  Defendant argues this evidence should be suppressed because he contends he was illegally seized at the time Officer Martin physically restrained him and he was not given any *Miranda* warnings.  (*Id.* at 2-3; Doc. 34 at 3.)  The Government, on the other hand, argues that Defendant was not illegally seized by Officer Martin and that *Miranda* warnings were not required for the interaction between Defendant and Officer Martin.   Further, the Government argues that if a *Miranda* violation is found to have occurred, this does not form the basis for suppression of the firearm found on Defendant.

6

### 1.    The encounter began as a consensual encounter.

> The Fourth Amendment prohibits unreasonable searches and seizures, but "[n]ot all personal encounters between law enforcement and citizens fall within the ambit of the Fourth Amendment." *United States v. Richards*, 611 F.3d 966, 968 (8th Cir. 2010) (alteration in original) (quoting *United States v. Jones*, 269 F.3d 919, 925 (8th Cir. 2001)). Consensual encounters between officers and citizens are permitted. *Id.* at 968–69.

*United States v. DaCruz-Mendes*, 970 F.3d 904, 908 (8th Cir. 2020). "Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002) (citations omitted). The Fourth Amendment is also "not implicated by a law enforcement officer simply approaching a parked vehicle and asking questions of the occupants." *United States v. Hodges*, No. CR10-2052, 2011 WL 1475654, at *3 (N.D. Iowa Apr. 14, 2011) (citing *United States v. Barry*, 394 F.3d 1070, 1075 (8th Cir. 2005); *United States v. Pajari*, 715 F.2d 1378 (8th Cir. 1983)). "If a reasonable person would feel free to terminate the encounter, then he or she has not been seized." *United States v. Lopez-Mendoza*, 601 F.3d 861, 865 (8th Cir. 2010) (citing *Drayton*, 536 U.S. at 201). A consensual encounter may become an unlawful seizure, however, if "it loses its consensual nature." *United States v. Carpenter*, 462 F.3d 981, 985 (8th Cir. 2006) (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). Even when officers have no basis for suspecting a particular individual, they can generally ask questions and request to examine his or her identification. *Lopez-Mendoza*, 601 F.3d at 865 (citing *Carpenter,* 462 F.3d at 985; *United States v. Granillo,* 288 F.3d 1071, 1075 (8th Cir. 2002)). Merely taking a person's driver's license and insurance card does not constitute a seizure. *Id.*

7

To seize a person, an officer must "convey a message that compliance with [his] request is required." *Id.* (quoting *Carpenter,* 462 F.3d at 985; citing *Bostick,* 501 U.S. at 434 ("Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.")).  A seizure may also occur if a reasonable person "believe[s] he or she is not free to refuse to answer" questions asked by a police officer.  *United States v. Richards*, 611 F.3d 966, 969 (8th Cir. 2010).  However, under the Fourth Amendment, police officers are not required to inform individuals of their right to refuse to answer questions. *See United States v. Vera*, 457 F.3d 831, 835 (8th Cir. 2006) (citing *Drayton*, 536 U.S. at 206–07).

> Whether an encounter is consensual depends on the facts of the case. *Jones*, 269 F.3d at 925. . . . A person is seized within the meaning of the Fourth Amendment when, under the totality of the circumstances, "a reasonable person would have believed that he was not free to leave." *Jones*, 269 F.3d at 925. Circumstances of a seizure may include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Flores*, 474 F.3d at 1103, quoting *United States v. White,* 81 F.3d 775, 779 (8th Cir. 1996). . . . Conversely, if a reasonable person feels free to "disregard the police and go about his business," the encounter is consensual. *Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991), quoting *California v. Hodari D.*, 499 U.S. 621, 628, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991). "The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S. Ct. 1975, 100 L. Ed. 2d 565 (1988).

*United States v. Munoz*, 590 F.3d 916, 921 (8th Cir. 2010).  The court also considers "the officer's retention of the person's property, or an officer's indication the person is the focus of a particular investigation." *United States v. Griffith*, 533 F.3d 979, 983 (8th

8

Cir. 2008) (citing *United States v. Ninety One Thousand Nine Hundred Sixty Dollars,* 897 F.2d 1457, 1461 (8th Cir. 1990)) (listing all factors).

The case at bar is analogous to *United States v. Barry*, in which the Eighth Circuit held that a police officer's conduct in approaching the defendant's parked vehicle and knocking on the window did not implicate the Fourth Amendment protection against unreasonable search and seizures. 394 F.3d 1070, 1075 (8th Cir. 2005) ("Sergeant Brothers's conduct in approaching Barry's parked vehicle and knocking on the window did not amount to a show of authority such that a reasonable person would believe he was not at liberty to ignore Sergeant Brothers's presence and go about his business."). In *Barry*, an officer drove his marked cruiser into an alley to see why a vehicle with its headlights on was parked in the alley at 11:18 p.m.. *Id.* The officer "exhibited no show of authority . . . he never raised his voice, he never drew his holstered weapon, he never activated his emergency lights, and he never ordered [the defendant] to exit his vehicle." *Id.* "[The officer] had merely approached a parked vehicle, which the Fourth Amendment permits." *Id.*

The *Barry* defendant argued he was seized because the officer physically constrained the defendant's movement by the parking his patrol car at the front of the defendant's vehicle. *Id.* at 1076. The defendant further argued he was seized based on the fact that the officer had visibly exited a marked patrol car in uniform and approached the defendant with his hand on his firearm. *Id.* The court disagreed, finding that the officer's conduct revealed a "uniformed police officer on duty cautiously approaching a parked vehicle at night." *Id.*

Just as in *Barry*, Officer Smith exhibited no show of authority when he approached the vehicle. Officer Smith asked the driver to put his window down and never drew his weapon or even put his hand on it. Officer Smith was parked on the northwest corner of the parking lot, out of sight of Defendant, and in no way impeded Defendant and the

9

driver from driving away. Further, Officer Smith never activated his emergency lights and, importantly, never ordered Defendant to exit the vehicle. Defendant exited on his own accord. Officer Smith merely approached a parked vehicle, which the Fourth Amendment permits. The other factors also suggest the encounter was consensual. Officer Smith approached the vehicle alone and never physically touched Defendant. Further, Officer Smith did not retain any of Defendant's property and did not indicate that Defendant was the focus of a particular investigation.

Accordingly, I find that the encounter began as a consensual encounter. The driver and Defendant voluntarily engaged with Officer Smith when there was no restraint on their freedom to leave. Although it is true that "most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." *I.N.S. v. Delgado,* 466 U.S. 210, 216 (1984); *Vera*, 457 F.3d at 835. I recommend the District Court find that the encounter began as a consensual encounter.

### 2. *Officer Smith had reasonable suspicion for an investigative stop when he smelled the odor of marijuana and saw open beer containers in a running vehicle.*

"There is no bright line between a consensual encounter and a *Terry* stop, rather, the determination is a fact intensive one which turns upon the unique facts of each case." *United States v. Beck*, 140 F.3d 1129, 1135 (8th Cir. 1998) (citations omitted). A police officer may stop and briefly question a person if the officer has reasonable, articulable suspicion of criminal activity. *See Terry v. Ohio*, 392 U.S. 1, 21 (1968). Under the Fourth Amendment, reasonable suspicion requires more than a hunch that criminal activity is afoot. *Griffith*, 533 F.3d at 984; *United States v. Steffens*, No. 19-CR-4022-LTS-KEM, 2019 WL 3304815, at *5 (N.D. Iowa July 23, 2019). "To satisfy the Fourth Amendment, officers must be able to articulate some minimal, objective

justification for a *Terry* stop." *Griffith*, 533 F.3d at 984 (citation omitted). The determination of whether an investigatory stop was justified is based on the totality of the circumstances. *Id.* at 983 (citing *United States v. Hughes*, 517 F.3d 1013, 1016 (8th Cir. 2008)).

During a *Terry* stop, officers must "employ the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the *Terry* stop." *United States v. Navarrete-Barron*, 192 F.3d 786, 790 (8th Cir. 1999) (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983)). Officers may check for weapons and may take any additional steps that are "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *Id.* (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)); *United States v. Sanford*, No. 14-CR-2036-LRR, 2014 WL 6680797, at *3 (N.D. Iowa Nov. 24, 2014) ("[T]he Eighth Circuit has held that, when there is a suspected crime of a dangerous nature and a 'good possibility' that the defendant had a weapon, 'the defendant's confinement with handcuffs in the back of a police car during [a search is] reasonably necessary to maintain the status quo, protect the officers, and allow them to conduct the search.'" (quoting *Navarrete–Barron*, 192 F.3d at 790) (second set of brackets in original))), *aff'd*, 813 F.3d 708 (8th Cir. 2016). "It is well established . . . that when officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons or even constrain the suspect with handcuffs in order to control the scene and protect their safety." *United States v. Fisher*, 364 F.3d 970, 973 (8th Cir. 2004).

Officer Smith testified that he could smell marijuana coming from the inside of the vehicle when the driver rolled down his window. Along with this, Officer Smith testified that the driver and Defendant had open bottles of beer with the vehicle running and that he was concerned about the possibility of an "impaired driver." Defendant argues "[n]o

11

criminal offense for possessing alcoholic beverage containers in a vehicle on private property is had, and no specific probable cause as to the defendant as to the root of the marijuana smell has been set forth."[4]  (Doc. 27-1 at 9.)

As an initial matter, Defendant overstates the standard for an investigative stop. "If police have reasonable suspicion, they 'may briefly stop an individual and make reasonable inquiries aimed at confirming or dispelling the suspicion.'"  *United States v. Williams*, 796 F.3d 951, 957 (8th Cir. 2015) (quoting *Hughes*, 517 F.3d at 1016). "Reasonable suspicion must be supported by more than a mere hunch, but the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying the preponderance of the evidence standard."  *United States v. Roberts*, 787 F.3d 1204, 1209 (8th Cir. 2015) (citation omitted).  Officer Smith did not need probable cause to ask Defendant to stay seated in the vehicle.  Officer Smith only needed a reasonable, articulable suspicion that criminal activity was afoot to change the consensual encounter into an investigative stop.

Defendant further argues "[t]hat defined lines must be drawn as to the initial purpose of the law enforcement appearance, the location alleged to emit an odor of marijuana, and the actions taken upon the Defendant's exit from the vehicle."  (Doc. 27-1 at 6.)  Defendant correctly notes that the "odor of marijuana emanating from a motor vehicle allows for the search of the motor vehicle."  (*Id.*) (citing *United States v. Beard*, 708 F.3d 1062, 1065 (8th Cir. 2013)).  Defendant then cites *United States v. Perdoma*, 621 F.3d 745 (8th Cir. 2010) for the proposition that "the distinction between a generalized odor from the vehicle, as opposed to a specific individual creates a differing set of facts and inquiry.  (*Id.*)  However, *Perdoma* relies upon *United States v. Humphries* which held that "if an officer smells the odor of marijuana in circumstances where the

---

[4] Defendant also argues that no "probable cause can be found in the opened alcohol containers." (Doc. 27-1 at 7.)

officer can localize its source to a person, the officer has probable cause to believe that the person has committed or is committing the crime of possession of marijuana" and thus has "authority to arrest him without a warrant in a public place. *United States v. Humphries*, 372 F.3d 653, 659-60 (4th Cir. 2004); *Perdoma*, 621 F.3d at 749. In the case at bar, just because Officer Smith was not able to immediately localize the source of smell of marijuana to Defendant does not mean Defendant was free to leave. Officer Smith was within his scope of authority to detain Defendant and the driver as part of a *Terry* stop to investigate the source of smell.

I find that based on the totality of the circumstances, Officer Smith had reasonable, articulable, objective justification that criminal activity was afoot when he smelled marijuana and saw open bottles of beer in the running vehicle. Officer Smith, relying on his specialized training, was immediately able to recognize the odor of marijuana when the driver rolled down the window. *Roberts*, 787 F.3d at 1209 ("[O]fficers may draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them." (internal quotations omitted)). Officer Smith could also see both the driver and Defendant holding open bottles of beer in a running vehicle.[5] In addition, Officer Smith knew the vehicle was parked in a high-crime area and that it was the only vehicle with people in it after gunfire was reported nearby. The totality of these circumstances gave Officer Smith reasonable suspicion that there was criminal activity afoot in the form of possession of a controlled substance in

---

[5] Defendant argues that "[t]he prohibition of open alcohol containers in a motor vehicle under Iowa law, either for passenger or driver, requires that the vehicle be on a public road" and that because Defendant and the driver were in a Motel 6 parking lot, they were free to assumedly have open containers in their running vehicle. (Doc. 27-1 at 8.) However, Officer Smith had reasonable, articulable, objective justification to believe that criminal activity was afoot in the form of operating a motor vehicle while intoxicated. Iowa Code § 321J.2(1)(a). At a bare minimum, in conjunction with the odor of marijuana, Officer Smith had reason to investigate further and figure out where the odor of marijuana was coming from and if either Defendant or the driver had been operating the vehicle while intoxicated.

13

violation of Iowa Code § 124.401(5), operating a motor vehicle while intoxicated in violation of Iowa Code § 321J.2(1)(a), and any possible crimes related to the suspected gunfire. This reasonable suspicion justified Officer Smith in asking Defendant to remain seated in the vehicle until the *Terry* stop could be concluded.

### 3. *Officer Martin's seizure of Defendant was still part of the* **Terry** *stop*

Defendant was not seized until Officer Martin physically restrained him from entering the motel room. *United States v. Mendenhall*, 446 U.S. 544, 553 (1980) ("[A] person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained."). Although Defendant was seized, I find that when Officer Martin arrived and physically restrained Defendant from entering the motel room, the encounter was still a *Terry* stop. As mentioned above, "officers may take any measures that are 'reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'" *United States v. Newell*, 596 F.3d 876, 879 (8th Cir. 2010) (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)). The use of handcuffs can also be a reasonable precaution during a *Terry* stop to protect officers' safety and to maintain the status quo. *See, e.g.*, *United States v. Miller*, 974 F.2d 953, 957 (8th Cir. 1992). Here, Officer Martin was responding to a request for backup and reported gunfire. Given the nature of the call and Officer Martin's legitimate concern for his own safety and the safety of the officers around him, it was a reasonable precaution to handcuff Defendant until he could determine whether Defendant was armed.

*United States v. Laing* 889 F.2d 281 (D.C. Cir. 1989) is instructive on when handcuffs are justified as part of an investigatory stop. In *Laing*, the court laid out a set of factors that may justify the use of handcuffs, these factors are "the time of day, the 'high-crime' nature of the area, an informant's tips that persons might be armed, furtive hand movements, flight or attempted flight by the person sought to be detained, and a pressing need for immediate action." *Id*. at 286 (citing *Adams v. Williams*, 407 U.S.

143, 147-148 (1972)). Here, Officer Martin's use of handcuffs is supported by these factors as Defendant attempted to enter his motel room while it was late at night in a high-crime area. Defendant's decision to enter the motel room forced Officer Martin to react because he did not know why Defendant was entering the motel room or what could be inside. Defendant managed to enter the motel room door open which caused the handcuffing to occur in the motel room. Officer Martin could see someone else in the motel room. (Gov. Ex. 2 at 1:23-1:26.) This constituted additional reason to restrain and search Defendant because Officer Martin now had to consider the possible threat posed by another person. I find Officer Martin's handcuffing of Defendant was an appropriate method of maintaining the status quo while further inquiry was made. *See United States v. Purry*, 545 F.2d 217, 220 (D.C. Cir. 1976) (finding that handcuffing of the defendant was appropriate when the defendant refused to give identification as part of a lawful stop); *see also United States v. White*, 648 F.2d 29, 40 (D.C. Cir. 1981) ("A 'reasonable' reaction in this context, like 'probable cause,' turns on "the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act'" (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949))).

I find that Officer Martin's physical restraint of Defendant was reasonably necessary to protect the officers' personal safety and to maintain the status quo during the stop. Officer Martin arrived at the scene after Officer Smith requested backup. Officer Martin noted the possible violations by Defendant and the driver as he walked past the vehicle, and he knew they were in a high-crime area and that he was responding to a report of suspected gunfire. In addition, Officer Martin knew that Officer Smith had told Defendant to stay in the vehicle, but Defendant disregarded that order. Officer Martin did not know what was inside of the motel room and what risks could arise if he allowed Defendant to enter the motel room. Officer Martin had no other choice but to restrain Defendant. Defendant did not submit to any of Officer Martin's requests to stop

entering the motel room and had not obeyed Officer Smith's lawful request to stay put during the course of the *Terry* stop. Officer Martin was not required to allow Defendant to enter the room and hope Defendant did not use the opportunity to obtain a weapon. *Newell*, 596 F.3d at 880 (finding that officers were not required to hope that the defendant was not arming himself while they questioned him through a heavily tinted window).

Defendant argues that "any threat or fear for officer safety by the defendant entering his room is unsubstantiated" because "two independent sources opined that the noise was fireworks, not gun shots; nor did any person . . . affirmatively state that they witnessed gun shots or the source of the alleged gun shots." (Doc. 27-1 at 8.) I respectfully disagree. Officer Smith and Officer Martin had, at best, conflicting reports about the gunshots. Officer Smith did not mention any evidence of fireworks in the area as he walked up to Defendant and driver in their vehicle, and Defendant was the only person who had told him that he thought the sound was fireworks. Officer Martin had only received information from an Uber driver that he thought the sounds were fireworks. It would be unreasonable to require Officer Smith and Officer Martin to accept these statements without fear for their safety just because they received a report inconsistent with the 9-1-1 call. Officer Smith was beginning his investigation of suspected gunfire, and Officer Martin had not yet arrived at the scene. At the very least, they were entitled to investigate more thoroughly before "any threat or fear for officer safety" could be deemed "unsubstantiated."

Officer Martin also had an independent justification for physically restraining Defendant and handcuffing him. By ignoring Officer Smith's request to stay seated in the vehicle, and Officer Martin's request to wait and not enter the motel room, Officer Martin reasonably believed Defendant had violated Iowa Code Section 719.1. This provision of the Iowa Code states that "[a] person commits interference with official acts when the person knowingly resists or obstructs anyone known by the person to be a peace

officer . . . in the performance of any act which is within the scope of the lawful duty or authority of that officer." Iowa Code § 719.1(1)(a). As noted above, it was within the scope of Officer Smith's lawful duties to request that Defendant stay seated in the vehicle during the *Terry* stop. By ignoring both Officer Smith's and Officer Martin's requests to wait, Officer Martin reasonably believed Defendant had violated Iowa Code Section 719.1 and thus had probable cause to seize Defendant at the doorway.

Accordingly, I find the encounter constituted a *Terry* stop that was supported by reasonable articulable suspicion from the time Officer Smith smelled marijuana from the vehicle and observed the driver and Defendant with open containers of alcohol. I also find that Officer Martin had an independent justification in seizing Defendant, that justification being Defendant's suspected violation of Iowa Code Section 719.1.

### 4. There was no violation of Defendant's **Miranda** rights.

Defendant argues that the following statements made by him were without *Miranda* warnings and should be suppressed:

Officer Martin: Why are you so adamant about getting in this room?

Defendant: Because I grabbed the wrong coat sir.

. . .

Officer Martin: Is this what you're worried about, what's in this? Chapstick?

Defendant: No, this pocket right here.

(Gov. Ex. 2 at 3:00-3:10; *Id.* at 4:05-4:13.) I respectfully disagree with Defendant and find that there was no *Miranda* violation. "*Miranda* requires that law enforcement agents provide certain prescribed warnings before conducting an interrogation of a suspect who is in custody." *United States v. New*, 491 F.3d 369, 373 (8th Cir. 2007). However,

[u]nder the public safety exception, a suspect's answer may be admitted into evidence if it was obtained in response to a question asked in furtherance of public safety and not designed solely to solicit testimonial evidence, even if *Miranda* warnings had not yet been given. *New York v.*

*Quarles,* 467 U.S. 649, 655–56, 659 n.8 (1984); *see United States v. Williams,* 181 F.3d 945, 954 n.13 (8th Cir. 1999). The exception does not depend upon the questioning officers' subjective motivation. Rather, it is judged under an objective standard and "applies when 'police officers ask questions reasonably prompted by a concern for the public safety.'" *United States v. Liddell,* 517 F.3d 1007, 1009 (8th Cir. 2008) (quoting *Quarles,* 467 U.S. at 656). The public to be protected can include the officers themselves. *Id.* (citing *Quarles,* 467 U.S. at 658 n.7, 659).

*United States v. Everman*, 528 F.3d 570, 572 (8th Cir. 2008). The exchange between Officer Martin and Defendant described above falls under this exception. At the time Officer Martin was questioning Defendant, the suspected gunfire was still under investigation. Officer Martin had limited information about the location of the gunfire. Defendant and the driver were the only two people at the location when the officers responded to the call, Defendant refused lawful orders to stay seated in the vehicle, and then hurried for the motel room door. Officer safety was still very much a legitimate concern as a shooter could have been at large or inside the motel room Defendant was trying to enter. This provided an objective basis to ask why Defendant was adamant about entering the motel room.

As Officer Martin was frisking Defendant, he had an objective basis to ask Defendant what he was worried about. Officer Martin did not know if Defendant was armed and there was a legitimate concern that he could discharge a weapon during the encounter. "Our prior cases recognized that the risk of police officers being injured by the mishandling of unknown firearms or drug paraphernalia provides a sufficient public safety basis to ask a suspect who has been arrested and secured whether there are weapons or contraband in a car or apartment that the police are about to search." *Liddell*, 517 F.3d at 1009–10; *see, e.g.*, *United States v. Luker*, 395 F.3d 830, 832 (8th Cir. 2005) (public safety exception applied to post-arrest question whether there was anything in intoxicated driver's car the police should know about); *Williams*, 181 F.3d at 953–54

(public safety exception applied to post-arrest question, "is there anything we need to be aware of" in the suspect's apartment, because the police "could not have known whether other hazardous weapons were present . . . that could cause them harm if they happened upon them unexpectedly or mishandled them in some way"). The form of Officer Martin's question is not objectionable. *Liddell*, 517 F.3d at 1009 n.2 ("Because this is an objective standard, and because police officers must react spontaneously to situations posing a threat to public safety, the public safety exception does not turn on the specific form of questions asked."). The function of Officer Martin's question—"Is this what you're worried about, what's in this? Chapstick?"—was to figure out if Defendant was armed with a weapon or had something else in his pockets that might injure him.

Accordingly, I find the statements Defendant seeks to have suppressed fall under the public safety exception to the *Miranda* requirement.

### 5. *Evidence of the firearm is admissible even if there was a* **Miranda violation.**

Even if Defendant were able to prove there was a *Miranda* violation, this would not require the physical evidence of the firearm found on Defendant's person to be suppressed. Defendant argues "the exclusionary rule limits the use of not only the primary evidence, but also the latter discovered evidence." (Doc. 34 at 4.) Defendant's argument is foreclosed by *United States v. Patane*, 542 U.S. 630 (2004). Judge Bennett accurately described the case as follows:

> In *Patane,* the Court held that non-testimonial evidence obtained as a result of incriminating statements made in violation of *Miranda* are admissible in the prosecution's case, provided the statements are made voluntarily, and are not the result of coercion. *Id.* at 634. The Court's reasoning for its decision is the "fruit of the poisonous tree" doctrine only applies if there has been a constitutional violation, and the Court has recognized that the mere failure to administer *Miranda* warnings, as long as the statements

were made voluntarily, does not give rise to a constitutional violation. *Id.* at 639.

*United States v. McManaman*, No. CR10-4024-MWB, 2010 WL 4103530, at *13 (N.D. Iowa Oct. 18, 2010), *aff'd*, 673 F.3d 841 (8th Cir. 2012). Defendant provides no evidence of coercion in the case at bar, the closest being that "[t]he statements made by [D]efendant are while he is handcuffed, while detained, . . . and occur within little more than three minutes lapse of the [D]efendant being physically restrained." (Doc. 34-1 at 5.) As shown above, Defendant was appropriately handcuffed and detained as part of the *Terry* stop, and the time lapse was the approximate time it took Officer Martin to search Defendant. Defendant was not coerced into saying he grabbed the wrong coat or that he had a firearm in his coat pocket. In fact, Defendant voluntarily admitted the presence of a firearm as Officer Martin was checking his other coat pocket. (Def. Ex. 2 at 4:05-4:15.)

Accordingly, I find that the physical evidence of the firearm is admissible, even if there was a *Miranda* violation.

## IV.   CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **deny** Defendant's Motion to Suppress. **(Doc. 27.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the District Court of any portion of the Report and Recommendation as well as the right to

appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

     **DONE AND ENTERED** at Cedar Rapids, Iowa, this 29th day of October, 2020.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa